******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* WILLIAM B. THOMAS
## (AC 38193)

Alvord, Keller and Bishop, Js.

*Syllabus*

Convicted of the crimes of sexual assault in the first degree, unlawful restraint in the first degree and false statement in the second degree, the defendant appealed to this court. He claimed, inter alia, that the trial court violated his constitutional rights to confrontation and to present a defense when it ruled that the rape shield statute (§ 54-86f [a]) prohibited him from introducing certain evidence of the victim's prior sexual conduct with two other men, B, and the victim's former boyfriend, R, in the seventy-two hours preceding the alleged sexual assault by the defendant. *Held*:

1. The defendant could not prevail on his unpreserved claim that evidence of the victim's prior sexual conduct with B and R was admissible to impeach her credibility pursuant to certain exceptions to § 54-86f (a), which permit the admission of prior sexual conduct evidence when such evidence is offered by the defendant on the issue of the credibility of the victim, provided that the victim testified on direct examination as to his or her sexual conduct, and the evidence is otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights: the defendant acknowledged that the victim never explicitly testified as to her sexual conduct with anyone other than the defendant, and in light of the fact that the victim did not testify, either explicitly or by reasonable inference, about her sexual conduct with anyone other than the defendant, the proffered evidence was not admissible for impeachment purposes under § 54-86f (a) (2), and, therefore, the defendant failed to demonstrate, pursuant to *State* v. *Golding* (213 Conn. 233), that the alleged constitutional violation existed or that it deprived him of a fair trial; moreover, impeaching the victim's credibility with evidence of her prior sexual conduct, and with an inconsistent statement she had made to a hospital nurse, was not so relevant and material, pursuant to § 54-86f (a) (4), that its exclusion violated the defendant's constitutional rights, as the defendant had impeached the victim with regard to a number of other inconsistent statements she made such that impeachment with the inconsistent statement to the nurse would have been largely duplicative and of marginal value to further undermining the victim's credibility.

2. The record was inadequate to review the defendant's unpreserved claim that evidence of the victim's prior sexual conduct with B should have been admitted, pursuant to § 54-86f (a) (1), to show an alternative source for the scrapes and bruises on the victim's body after the sexual assault at issue, the record having been devoid of information probative of the location and nature of the victim's sexual encounter with B.

3. This court declined to review the defendant's unpreserved claim that he was improperly prohibited from inquiring and presenting evidence about the victim's relationship with B in order to show the victim's motive and bias to lie, which he claimed should have been admitted pursuant to the exception in § 54-86f (a) (4); the defendant likely could have inquired into whether the victim and B had a romantic relationship without implicating the prohibition in § 54-86f (a) of prior sexual conduct evidence, and because any sexual conduct between the victim and B may have been relevant, but was not essential, to that inquiry, the claim was not of constitutional magnitude for purposes of review pursuant to *Golding*.

4. Contrary to the defendant's claim, evidence of the victim's prior sexual conduct with B and R was not probative, pursuant to § 54-86f (a) (1), of whether her vaginal injuries could have been caused by anyone other than the defendant; there was no testimony about a purported makeshift panty liner that the defendant sought to introduce into evidence and it, thus, had no probative value, testimony from a hospital nurse that rough consensual sexual relations could cause vaginal injury was unhelpful to the defendant, who failed to proffer evidence that the victim had had

a rough sexual encounter with B or R, the defendant's offer of proof as to the victim's alleged sexual intercourse with R was speculative and inadequate, and evidence that the victim had sexual relations with B in the hours preceding her intercourse with the defendant was not probative of whether someone other than the defendant caused her vaginal injuries.

5. The defendant could not prevail on his claim that the trial court abused its discretion by denying his motion for funds to pay for investigative services for his defense; because the statutes governing public defender services require the Public Defender Services Commission to authorize such expenditures when the commission determines, as a threshold matter, that such services are reasonably necessary to the defense, the trial court did not have the discretion to grant the request, and even if it did, the defendant failed to make a proper showing that the funds for investigative services were reasonable and necessary to the defense.

6. The defendant's claim that he was denied his right to a fair trial as a result of the prosecutor's allegedly improper remarks during closing argument to the jury was unavailing; the prosecutor's remarks that defense counsel had conducted a "cutting" cross-examination of the victim and "did a great job of testifying," and certain other comments of the prosecutor, were not improper, as they did not amount to an attempt to demean or impugn the integrity of defense counsel, the prosecutor did not appeal to the jurors' emotions or to their sympathies for the victim, and did not refer to facts or documents that were not in evidence, and this court declined to review the defendant's claim that the prosecutor improperly vouched for the victim's credibility, that claim having been inadequately briefed.

Argued May 18—officially released October 17, 2017

*Procedural History*

Substitute information charging the defendant with the crimes of sexual assault in the first degree, unlawful restraint in the first degree and false statement in the second degree, brought to the Superior Court in the judicial district of Litchfield, where the court, *Ginocchio, J.*, denied the defendant's motions for costs related to the defense and to admit certain evidence; thereafter, the matter was tried to the jury; subsequently, the court denied the defendant's motion to open the evidence; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Philip M. Chabot*, certified legal intern, with whom was *James B. Streeto*, senior assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom were *Dawn Gallo*, senior assistant state's attorney, and, on the brief, *David S. Shepack*, state's attorney, and for the appellee (state).

*Opinion*

KELLER, J. The defendant, William B. Thomas, appeals from the judgment of conviction, rendered after a jury trial, of one count of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), one count of unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a), and one count of false statement in the second degree in violation of General Statutes (Rev. to 2011) § 53a-157b (a). On appeal, the defendant claims that (1) the trial court violated his constitutional rights to confrontation and to present a defense by excluding evidence of the victim's[1] prior sexual conduct under General Statutes § 54-86f,[2] commonly known as the rape shield statute; (2) the trial court violated his right to due process by denying his pretrial motion for costs to pay for investigative services necessary to his defense; and (3) the state's closing argument was improper and deprived him of a fair trial.[3] We disagree. Accordingly, we affirm the judgment of the court.

The jury reasonably could have found the following facts. The events in question took place on September 2, 2011, and into the early morning hours of September 3, 2011. The victim was nineteen years old at the time. In the early evening of September 2, the victim drove to a Burger King in Torrington. There she met with a friend, Garrett Gomez. Leaving her car at the Burger King, the victim and Gomez traveled in Gomez' car to his residence in Winsted. The victim then bought heroin from Gomez and used two bags worth.

The victim and Gomez next met with another friend, Mike Boyle, at a reservoir in Barkhamsted, where they spent time fishing. The victim also used more heroin there. The victim and Boyle then went to Boyle's house, where they ate dinner. At about this time, the victim drank alcohol as well.

At about midnight, Boyle drove the victim to Snapper Magee's, a bar in Torrington. While there, she drank more alcohol. The victim stayed at the bar until it closed. By that time, Boyle had left. The victim therefore needed a ride back to her car at the Burger King.

The defendant was also at Snapper Magee's that night, having walked there after his shift as a cook at a nearby restaurant. At closing time, the defendant was outside in front of the bar. The victim approached the defendant and asked for a ride. The defendant told her that he would help, and the pair walked to the bar's parking lot. The defendant did not have a car in the parking lot.

Once at the lot, between two parked cars, the victim performed oral sex on the defendant, and the defendant digitally penetrated her vagina. It is undisputed that these activities were consensual.

After the sexual encounter took place, the victim was still in need of a ride. At the defendant's direction, the victim and the defendant proceeded to walk down a nearby street. The victim asked the defendant how he would give her a ride. The defendant told her that a friend would do so.

The pair approached a white house where the defendant indicated that the friend was located. The defendant, however, with the victim still following, walked past the house and through an opening in a nearby chain-link fence. On the other side of the fence lay railroad tracks. With the pair standing on the tracks, the defendant began kissing the victim. He then began pushing her head down toward his genitals. With the victim resisting, the defendant forced her head onto his penis. He then forced her down to the ground and, while straddling her, removed her clothes. The defendant penetrated her vagina, and then her anus, with his penis.

The victim was then able to get away. She grabbed some of her clothes and ran. At some point, she was able to put her shorts on. She continued running, topless, until she reached an entryway to a bank, where she sat, covering her chest with her knees. A bystander called the police, and the victim was transported to Charlotte Hungerford Hospital for treatment.

The defendant was charged with one count of sexual assault in the first degree in violation of § 53a-70 (a) (1), one count of unlawful restraint in the first degree in violation of § 53a-95 (a), and one count of false statement in the second degree in violation of § 53a-157b (a).[4] A three day trial commenced on October 16, 2013. The defendant did not testify. His attorneys argued during closing remarks that the intercourse on the railroad tracks, the conduct underlying the sexual assault and unlawful restraint charges, was consensual. On October 23, 2013, the jury returned a verdict of guilty on all three counts. The court thereafter rendered judgment imposing a total effective sentence of seven years imprisonment, followed by eight years of special parole, with lifetime registration as a sex offender. This appeal followed. Additional facts will be provided in the context of the defendant's claims.

I

The defendant first claims that the court violated his constitutional rights to confrontation and to present a defense, as guaranteed by the sixth and fourteenth amendments to the United States constitution, by excluding evidence of the victim's prior sexual conduct under § 54-86f. We disagree.

The following additional facts are relevant to this claim. Several weeks before trial, the defendant filed a "Motion for Evidentiary Hearing Pursuant to [§] 54-86f." In that motion, the defendant represented that the

victim "admitted to having sexual relations with her then boyfriend in the hours prior to the alleged sexual relations with the defendant." Without further explanation, the defendant asserted that "[t]his evidence is clearly relevant to the defense of consent." He therefore requested an evidentiary hearing "regarding the admissibility of [the victim's] sexual conduct in the minutes and hours prior to the time when the defendant is accused of sexually assaulting her."

The parties presented oral argument on the motion prior to trial. During that hearing, the state acknowledged that the victim had indicated (in what was later identified as a written statement to the Torrington police) that she had had sexual relations with "another boyfriend" "prior to going out" on the evening in question.[5] The state also told the court that preliminary results of tests conducted on the victim's rape kit showed the presence of two DNA profiles, one from the defendant, the other from an unnamed depositor. The state questioned the relevance of this evidence.

At the hearing, the defendant argued that the victim's prior sexual intercourse with the boyfriend "goes to [the victim's] credibility in terms of . . . this is a yes, this is a no type of a thing in terms of the consent." The defendant further argued that "[i]t goes to consent. It goes to [the victim's] pattern of practice in terms of what she was doing out that night. . . . It also goes to intoxication and possible alcohol use affecting her credibility."

The court denied the motion, concluding: "My inclination is, I'm not going to allow any testimony as to the other DNA sample. It goes to her sexual contact with a person that's not involved in this case."

The defendant filed another motion for an evidentiary hearing pursuant to § 54-86f two days before trial. In it, the defendant repeated the assertion that the victim had had sexual relations with the aforementioned boyfriend in the hours before the alleged sexual assault. The motion also added new information. It represented that, "[u]pon information and belief, [the victim] may also have engaged in sexual relations with *another man* within twenty-four (24) hours of having engaged in sexual relations with the aforementioned [boyfriend] and the defendant." (Emphasis added.) It then asserted that, when the victim was being treated at the hospital, a nurse, Cheryl Underwood, as part of the evaluation and evidence collection process, asked her whether she had had sexual relations with anyone other than the defendant in the seventy-two hours preceding the alleged sexual assault, and that she had answered no. The motion then added that the victim "acknowledged in her second written statement to the [Torrington police] that she had engaged in intercourse with at least one other person" on the evening of the incident at issue. Accordingly, the defendant argued that the victim's

prior sexual conduct with the other individuals was "so relevant and material to the issue of credibility that to deny the defendant the right to introduce evidence regarding this issue would severely prejudice the defendant and violate his right to a fair trial." (Emphasis omitted.)

The court heard oral argument on the motion on the first day of trial before the presentation of evidence. At that hearing, the defendant provided some additional information. The defendant explained that the "boyfriend" identified in the first motion (later identified as Boyle) was not in fact "dating" the victim, although the defendant still maintained that Boyle had sexual relations with her shortly before the alleged sexual assault. The "real" boyfriend, the defendant contended, was the individual identified in the second motion as having had sexual relations with the victim in the twenty-four hours before she had sexual relations with Boyle and the defendant. This individual was later identified by the state as an individual named Kevin Roberge. The defendant argued that "the reason why [the victim] didn't disclose [that she was with Roberge] is [because] the two of them had been arrested on a domestic incident two months earlier. We believe that there was a protective order in place with respect to [Roberge]; and the fact that these two were together earlier in the day, sexual conduct aside, we believe may have been in violation of the protective order." The defendant also added that the victim's prior sexual relations with Boyle and Roberge may help explain some of the injuries—scrapes and bruises—observed on her at the hospital and by the police after the alleged sexual assault, though he did not explain how.

The court denied the motion, but expressly did not preclude the defendant from questioning the victim about the cause of her injuries so long as the questions did not concern her sexual relations with anyone other than the defendant.

On the first day of trial, the state elicited the following testimony from the victim during its case-in-chief:

"[The Prosecutor]: Did you feel pain as a result of [the alleged sexual assault]?

"[The Victim]: Yes.

"[The Prosecutor]: Could you describe that for the jury?

"[The Victim]: Vaginally, I felt pain and—

"[The Prosecutor]: Were you on birth control at the time?

"[The Victim]: Yes.

"[The Prosecutor]: And as a result of that birth control, did you not have any menstrual bleeding?

"[The Victim]: No.

"[The Prosecutor]: So, that kept you from bleeding.

"[The Victim]: Yes.

"[The Prosecutor]: Did you have any bloody discharge as a result of this incident?

"[The Victim]: Yes.

"[The Prosecutor]: Vaginal discharge?

"[The Victim]: Yes."

When the state's direct examination of the victim concluded, the defendant addressed the court, in the absence of the jury, as follows: "[T]here was some questioning on direct examination regarding any bloody discharge as part of the vaginal examination. And there [were] questions posed regarding whether she was menstruating, and because of medications that's not occurring.

"Then there was a question regarding did the bloody discharge come from this incident. If I'm not allowed to question as to where else that bloody discharge may have come from, the jury is now stuck with the impression that it had to come from here. There was a question—there were questions posed on direct that open the door as to the source of these injuries, her source of things that were found as part of the sexual assault examination that happened at the hospital. That bloody discharge could have come from other places. And going back to that question about whether there was any intercourse within a seventy-two hour period, that question is clearly—clearly asked for the purposes of determining other potential sources of evidence or injuries.

"And, Your Honor, I respectfully submit if we are foreclosed from this, I believe it directly affects my client's right to a fair trial. . . . I think the door has been opened here, and I believe that that is an area that we must be able to examine."

After further argument by the defendant and the state, the court concluded: "You can ask [the victim] if she had any injuries to her vaginal area on that date, but I'm not going to allow you to get into prior sexual conduct with anybody other than the defendant." On cross-examination, the defendant did not ask the victim whether she had any injuries to her vaginal area prior to the alleged sexual assault. The defendant later explained to the court why he did not pursue that line of inquiry: "I didn't because if her answer was no, I was stuck with that, I wasn't going to be allowed to cross-examine her about the fact that she did have intercourse with other people and there were other sources."

On the second day of trial, the stated rested its case. In his case-in-chief, the defendant first presented the testimony of Underwood, the nurse who had treated the victim at the hospital. At the defendant's request,

the court also qualified Underwood to testify as an expert in the field of sexual assault examinations. The defendant asked Underwood whether, in her examination of the victim, Underwood "note[d] any bloody discharge, vaginal discharge?" Underwood responded in the affirmative. During Underwood's testimony, the following exchange also occurred:

"[Defense Counsel]: In your training and experience, what are certain sources of such a discharge?

"[Underwood]: For a possible sexual assault from trauma.

"[Defense Counsel]: Now, what do you mean by, from trauma?

"[Underwood]: Forced penetration, um, use of objects.

"[Defense Counsel]: Rough sex? . . .

"[Underwood]: [Y]es, it could be as well.

"[Defense Counsel]: So, consensual rough sex may result in trauma, correct?

"[Underwood]: It could.

"[Defense Counsel]: Now, can a bloody discharge also be caused by menstruation?

"[Underwood]: Yes, it can.

"[Defense Counsel]: Can trauma also be caused by digital penetration?

"[Underwood]: Yes."

After Underwood's testimony, the defendant did not make another offer of proof seeking admission of evidence of the victim's prior sexual conduct.

The defendant later presented the direct testimony of Boyle. Boyle testified that he knew the victim from high school, and that, prior to the evening in question, he had not seen her in "[p]robably over a year." He denied that he was dating her at the time of the incident.

Jury deliberations began on October 18, 2013. On October 23, 2013, with those deliberations ongoing, the defendant filed a motion with the court to open the evidentiary portion of the case. The court heard oral argument on the motion that day. In his argument, the defendant referred to a photograph taken by the Torrington police in connection with the investigation into the alleged sexual assault. The defendant asserted that the photograph depicted "a piece of paper with some stains on it" "folded in the shape of a makeshift panty liner." The defendant reasoned that, if that purported makeshift panty liner was used by the victim and then discarded at the railroad tracks, "that would tend to implicate that [the victim] is not credible regarding the source of the vaginal bleeding and would also bear directly on . . . the innocence of the defendant as to

the crimes charged." The defendant stated that he would recall a Torrington police officer who testified in the case, as well as the victim, for questioning about the evidence. In response to questioning by the court, the defendant acknowledged that he had had the photograph "[a]t least thirty days before the trial, perhaps far earlier than that." The court denied the motion, but ordered that "[the] evidence be preserved, that it be brought into the courthouse, and it be put into an envelope and sealed for appellate purposes." Later on the same day, the jury returned its verdict.

Before proceeding to our analysis, we observe the following background on and legal principles related to this state's rape shield statute. Prior to the advent of rape shield laws in the 1970s, "[e]vidence of [a rape complainant's] previous sexual conduct was deemed relevant at common law on the issue of whether the . . . complainant had consented to sexual relations on the occasion in question—a complete defense, if established, to a charge of forcible rape." (Footnotes omitted.) H. Galvin, "Shielding Rape Victims in the State and Federal Courts: A Proposal for the Second Decade," 70 Minn. L. Rev. 763, 766 (1986). Indeed, Wigmore wrote that "[t]he non-consent of the complainant is [in rape cases] a material element; and the character of the woman as to chastity is of considerable probative value in judging of the likelihood of that consent." 1A J. Wigmore, Evidence (Tillers Rev. 1983) § 62, pp. 1260–61.

Our legislature, by enacting § 54-86f, abrogated that common-law rule. It "has determined that, except in specific instances, and taking the defendant's constitutional rights into account, evidence of prior sexual conduct is to be excluded for policy purposes. Some of these policies include protecting the victim's sexual privacy and shielding her from undue [harassment], encouraging reports of sexual assault, and enabling the victim to testify in court with less fear of embarrassment. . . . Other policies promoted by the law include avoiding prejudice to the victim, jury confusion and waste of time on collateral matters." (Citation omitted.) *State* v. *Cassidy*, 3 Conn. App. 374, 379, 489 A.2d 386, cert. denied, 196 Conn. 803, 492 A.2d 1239 (1985).

Section 54-86f provides in relevant part: "(a) . . . [N]o evidence of the sexual conduct of the victim may be admissible unless such evidence is (1) offered by the defendant on the issue of whether the defendant was, with respect to the victim, the source of semen, disease, pregnancy or injury, or (2) offered by the defendant on the issue of credibility of the victim, provided the victim has testified on direct examination as to his or her sexual conduct, or (3) any evidence of sexual conduct with the defendant offered by the defendant on the issue of consent by the victim, when consent is raised as a defense by the defendant, or (4) otherwise so relevant and material to a critical issue in the case

that excluding it would violate the defendant's constitutional rights. . . ." Further, "[s]uch evidence shall be admissible only after an in camera hearing on a motion to offer such evidence containing an offer of proof. If the proceeding is a trial with a jury, such hearing shall be held in the absence of the jury. If, after a hearing, the court finds that the evidence meets the requirements of this section and that the probative value of the evidence outweighs its prejudicial effect on the victim, the court may grant the motion. . . ." General Statutes § 54-86f (a).

Our Supreme Court has set forth two requirements that must be met before a trial court may admit evidence of a victim's sexual conduct. First, the defendant must show that the evidence is "relevant." See, e.g., *State v. Shaw*, 312 Conn. 85, 104–106, 90 A.3d 936 (2014). Generally, " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1. Facts are "material" when they are "directly in issue or . . . probative of matters in issue." C. Tait & E. Prescott, Connecticut Evidence (5th Ed. 2014) § 4.1.3, p. 154.

With respect to evidence potentially falling under the rape shield statute, our Supreme Court has concluded that evidence offered "merely to demonstrate the unchaste character of the victim" is generally not relevant. (Internal quotation marks omitted.) *State v. Shaw*, supra, 312 Conn. 104. Rather, the evidence must be "relevant to establish some portion of the theory of defense or rebut some portion of the state's case . . . ." (Internal quotation marks omitted.) Id., 105.

In order to establish the relevance of prior sexual conduct evidence, the defendant must make an offer of proof to the court. Id., 105–106. "Offers of proof are allegations by the attorney . . . in which he represents to the court that he could prove them if granted an evidentiary hearing." (Internal quotation marks omitted.) Id., 105 n.13. In the context of the rape shield statute, "[a] clear statement of the defendant's theory of relevance is all important in determining whether the evidence is offered for a permissible purpose." *State v. Sullivan*, 244 Conn. 640, 647, 712 A.2d 919 (1998).

If the court determines that the proffered evidence is relevant, it then proceeds to the next step of the process by conducting an evidentiary hearing out of the presence of the jury. *State v. Shaw*, supra, 312 Conn. 105–106 and 106 n.13; see also General Statutes § 54-86f (a). If, after the evidentiary hearing, "the court finds that the evidence meets the requirements of [§ 54-86f (a)] and that the probative value of the evidence outweighs its prejudicial effect on the victim, the court may grant the motion." *State v. Shaw*, supra, 104.

When a trial court improperly excludes evidence in a criminal matter, the defendant's constitutional rights may be implicated. "It is fundamental that the defendant's rights to confront the witnesses against him and to present a defense are guaranteed by the sixth amendment to the United States constitution. . . . In plain terms, the defendant's right to present a defense is the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . The right of confrontation is the right of an accused in a criminal prosecution to confront the witnesses against him. . . . The primary interest secured by confrontation is the right to cross-examination . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Wright*, 320 Conn. 781, 816–17, 135 A.3d 1 (2016).

Nevertheless, "[i]t is well established that a trial court has broad discretion in ruling on evidentiary matters, including matters related to relevancy. . . . Accordingly, the trial court's ruling is entitled to every reasonable presumption in its favor . . . and we will disturb the ruling only if the defendant can demonstrate a clear abuse of the court's discretion." (Internal quotation marks omitted.) *State* v. *Shaw*, supra, 312 Conn. 101–102. Further, "[w]e have emphasized in numerous decisions . . . that the confrontation clause does not give the defendant the right to engage in unrestricted cross-examination. . . . A defendant may elicit only relevant evidence through cross-examination. . . . The court determines whether the evidence sought on cross-examination is relevant by determining whether that evidence renders the existence of [other facts] either certain or more probable." (Internal quotation marks omitted.) *State* v. *Crespo*, 303 Conn. 589, 610–11, 35 A.3d 243 (2012).

We now turn to our analysis of the defendant's claim. As previously mentioned, he claims that the court violated his constitutional rights to confrontation and to present a defense by excluding evidence of the victim's prior sexual conduct under the rape shield statute. In support of this claim, the defendant advances several theories of admissibility. To the extent that his claim of error under a particular theory of admissibility was not preserved, the defendant seeks review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable

doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original; footnote omitted.) Id., 239–40; see *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying *Golding*'s third prong). We analyze each of the defendant's theories of admissibility in the following subparts.

A

We first address the defendant's argument that evidence of the victim's prior sexual conduct with Boyle and, purportedly, also with Roberge, was admissible to impeach her credibility under the second and fourth exceptions to the rape shield statute. Those exceptions permit the admission of prior sexual conduct evidence when such evidence is "offered by the defendant on the issue of credibility of the victim, provided the victim has testified on direct examination as to his or her sexual conduct"; General Statutes § 54-86f (a) (2); and "otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights. . . ." General Statutes § 54-86f (a) (4).

We first discuss the defendant's § 54-86f (a) (2) argument. We emphasize that, in order to have evidence admitted under this exception to the rape shield statute, the victim must first have "testified on direct examination as to his or her sexual conduct . . . ." General Statutes § 54-86f (a) (2); see also *State* v. *Njoku*, 163 Conn. App. 134, 154, 133 A.3d 906, cert. denied, 321 Conn. 912, 136 A.3d 644 (2016). The defendant acknowledges that the victim never explicitly testified as to her sexual conduct with anyone other than the defendant, but nevertheless contends that she *indirectly* testified about it because "she did state, with certainty, that the source of [her] bloody discharge was caused by the defendant," and "this statement can be interpreted to mean that she only had [sexual relations] with one person that day . . . ."

As an initial matter, we observe that the defendant did not distinctly raise this argument, either as an evidentiary or a constitutional matter, before the trial court. Although, following the victim's direct testimony in which she indicated that the defendant caused her vaginal injuries, the defendant sought to have evidence of her prior sexual conduct admitted in order to attempt to show an alternative source for those injuries, the defendant did not argue that the victim's testimony concerning the injuries amounted to an assertion that she had sexual relations with only one person during the twenty-four hours preceding the incident. "Ordinarily, we will not consider a theory of relevance that was not raised before the trial court. . . . The defendant, however, does not bring a purely evidentiary

claim, but claims that the exclusion of the evidence deprived him of his right to confrontation and his right to present a defense." (Citation omitted.) *State* v. *Adorno*, 121 Conn. App. 534, 548 n.4, 996 A.2d 746, cert. denied, 297 Conn. 929, 998 A.2d 1196 (2010). The defendant must therefore satisfy the requirements of *State* v. *Golding*, supra, 213 Conn. 239–40, in order to prevail on this argument. See *State* v. *Adorno*, supra, 548 n.4 (proceeding to *Golding* analysis on unpreserved evidentiary claim).

We conclude that the claim fails to satisfy *Golding*'s third prong—that is, that "the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial . . . ." *State* v. *Golding*, supra, 213 Conn. 240. We do not dispute that, in certain cases, even if a sexual assault victim's direct testimony does not explicitly refer to "sexual conduct," inferences that can be drawn from such testimony could open the door to the admission of prior sexual conduct evidence under § 54-86f (a) (2). Cf. *State* v. *Shaw*, supra, 312 Conn. 107 ("[§] 54-86f encompasses inferential as well as direct evidence of sexual conduct" [internal quotation marks omitted]). But that is not the case here. The victim's testimony that the alleged sexual assault caused her vaginal trauma is not remotely akin to stating that she, in the defendant's words, "only had [sexual relations] with one person that day . . . ." In light of the fact that the victim did not testify, either explicitly or by reasonable inference, about her sexual conduct with anyone other than the defendant, the proffered evidence was not admissible for impeachment purposes under § 54-86f (a) (2). Accordingly, we are not persuaded on the basis of this argument that the alleged constitutional violation exists or that it deprived the defendant of a fair trial.

We next discuss the defendant's argument that evidence of the victim's prior sexual conduct was admissible under the fourth exception to the rape shield statute because impeaching the victim's credibility on that subject was "so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights. . . ." General Statutes § 54-86f (a) (4). More specifically, the defendant argues that, in light of the fact that the victim had sexual relations with Boyle and, possibly, Roberge, in the seventy-two hours preceding the incident, he should have been permitted to impeach the victim's credibility by presenting both evidence that she had sexual relations with those individuals as well as her statement to Underwood in which she denied having sexual relations with anyone other than the defendant in the three days preceding the alleged sexual assault.[6] The defendant contends that this is particularly true because "statements to medical providers are extremely reliable," and anything bearing on the victim's credibility in this "he said, she said" case would necessarily be significant.

As previously mentioned, in his second pretrial motion for an evidentiary hearing pursuant to § 54-86f, the defendant made a similar argument based in part on the fourth exception to the rape shield statute and the sixth amendment to the United States constitution. The court denied that motion. On appeal, however, the defendant relies in part on events in the trial that occurred *after* the court's denial (and which, therefore, the court was necessarily unaware of when it made its ruling) to support his argument that the proffered evidence was admissible under § 54-86f (a) (4) to impeach the victim's credibility. We therefore consider the present constitutional claim to be unpreserved because it is based on a theory of admissibility that was not raised at trial. Accordingly, we review it under *State* v. *Golding*, supra, 213 Conn. 233; see also *State* v. *Adorno*, supra, 121 Conn. App. 548 n.4.

As with the previous argument, we are not persuaded that "the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial . . . ." *State* v. *Golding*, supra, 213 Conn. 240. "In determining whether the cross-examination of [the victim] was unduly restricted it is the *entire* cross-examination which we must examine. . . . [W]e consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Crespo*, supra, 303 Conn. 612. At trial, the defendant impeached the victim with regard to a number of other inconsistent statements that she had made to the police and hospital staff in connection with the incident.[7] In light of this, impeaching the victim by introducing evidence of the inconsistent statement to Underwood would have been largely duplicative, and therefore of marginal value to further undermining her credibility. We also fail to see how impeaching the victim with regard to her statement to Underwood would be significant apart from its tendency to contradict the victim—it was, of course, the *defendant's* conduct that was at issue in the case. Accordingly, we are not persuaded that the alleged constitutional violation exists or that it deprived the defendant of a fair trial. See *State* v. *Golding*, supra, 240.

B

We next address the defendant's argument that evidence of the victim's prior sexual conduct should have been admitted under § 54-86f (a) (1) in order to show an alternative source for the scrapes and bruises that were observed on the victim's body after the alleged sexual assault. Specifically, the defendant argues: "Because defense counsel was prohibited from inquiring about the previous encounter with Boyle, it is unknown if [the victim] had [sexual relations] with

Boyle at the [reservoir] where they were fishing . . . or at his home. If [the victim] had [sexual relations] with [Boyle] at the [reservoir], the scrapes and minor injuries on [her] body could also have easily come from such an encounter." (Citation omitted.) We decline to review the merits of this argument.

The following facts are relevant to this issue. As alluded to previously, the victim testified that she went to the Barkhamsted reservoir with Boyle and Gomez after going to Gomez' house. She testified that they spent time fishing there and that she used heroin there as well. The victim also testified that, after leaving the reservoir, but before going to Snapper Magee's, she went to Boyle's house and ate dinner there. During oral argument before the court on his first pretrial motion for an evidentiary hearing pursuant to § 54-86f, the defendant asserted, and the state acknowledged, that in a written statement to the police (not admitted into evidence), the victim disclosed that she and a "boyfriend" (later identified as Boyle) had sexual relations on the day of the alleged sexual assault. At trial, the state entered into evidence photographs taken just after the alleged sexual assault showing scrapes and bruises on different parts of the victim's body.

The defendant did not distinctly raise the present argument, either as an evidentiary or a constitutional matter, at trial. Although, at one point, he baldly asserted that the victim's prior sexual conduct with Boyle and, purportedly, Roberge, may help explain some of the bruises and scrapes shown in the photographs, he never suggested that a sexual encounter involving the victim took place *at the reservoir*. The defendant must therefore satisfy the requirements of *State* v. *Golding*, supra, 213 Conn. 239–40, in order to prevail on this argument.

Of course, had it actually been established that the victim and Boyle had sexual relations *at the reservoir*, that evidence might have been probative of the provenance of the victim's nonvaginal injuries. As it happens, though, the record discloses only two things relating to this issue: (1) that the victim and Boyle had sexual intercourse, and (2) that at some point on the day they had sexual intercourse, they visited the reservoir.

We conclude that the record is not adequate to review this particular argument. See id., 239. It is well recognized that "[w]hen the constitutional claim is one that is especially fact dependent . . . the failure to preserve the claim before the trial court often results in an inadequate factual record for review, thus leading to the claim's failure on the merits." *State* v. *Elson*, 311 Conn. 726, 750–51, 91 A.3d 862 (2014). The record is devoid of any information probative of the location and nature of the sexual encounter with Boyle—as far as the record discloses, it appears equally likely that the sexual encounter occurred at Boyle's house (where the two

had dinner) or at some other location, rather than at the reservoir. Accordingly, this argument fails under the first prong of *State* v. *Golding*, supra, 213 Conn. 239; we therefore decline to reach its merits.

C

We next address the defendant's argument that he was improperly "prohibited from inquiring about [the victim's] relationship with Boyle, both emotion[al] and physical, to show motive and a bias to lie about the sexual assault." The defendant argues that this evidence should have been admitted under the fourth exception to the rape shield statute. See General Statutes § 54-86f (a) ("no evidence of the sexual conduct of the victim may be admissible unless such evidence is . . . (4) otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights"). We decline to review the merits of this argument.

The defendant did not raise this particular argument at trial in either its evidentiary or constitutional form. In fact, one of the defendant's theories at trial was that Boyle was *not* the victim's boyfriend—rather, the defendant insisted that Roberge was. Although the defendant suggested to the court that the victim's motive for "lying" to the police about Roberge (how exactly the victim "lied" in this context is unclear) was somehow relevant to the case, he never argued that the victim's relationship with *Boyle* provided a motive to fabricate the alleged sexual assault by the defendant.[8] The defendant must therefore satisfy the requirements of *State* v. *Golding*, supra, 213 Conn. 239–40, in order to prevail on this argument.

On appeal, the defendant argues that the court improperly "disallowed the introduction of [the victim's] relationship with Boyle, both physical and emotional, to [support] the defendant's theory that this accusation was fabricated to hide the consensual encounter with the defendant from Boyle, her then boyfriend." We observe, however, that the defendant was not necessarily prohibited from inquiring into whether the victim and Boyle were "boyfriend and girlfriend" or had some other romantic relationship. Section 54-86f (a) pertains, after all, only to the "*sexual conduct* of the victim . . . ." (Emphasis added.) What the defendant appears to be arguing, essentially, is that the victim liked Boyle romantically, Boyle somehow became aware of her consensual intercourse with the defendant, and then, in an attempt to salvage her romantic relationship with Boyle, the victim fabricated the sexual assault charge against the defendant.[9] The defendant suggests that the victim's having sexual relations with Boyle earlier in the day would be a critical piece of evidence in supporting, or would at least tend to support, this argument. We conclude that this claim is not "of constitutional magnitude alleging the violation of a

fundamental right . . . ." *State* v. *Golding*, supra, 213 Conn. 239–40. As stated previously, the defendant could likely have inquired into whether the victim and Boyle had a romantic relationship without implicating the rape shield statute's general prohibition on "sexual conduct" evidence. General Statutes § 54-86f (a). Any sexual conduct between the victim and Boyle may have been relevant, but it was certainly not essential, to this inquiry. "[O]nce identified, unpreserved evidentiary claims masquerading as constitutional claims will be summarily dismissed." *State* v. *Golding*, supra, 241. Accordingly, we decline to review the merits of this argument.

D

Finally, we address the defendant's argument that the court should have admitted evidence of the victim's prior sexual conduct with Boyle and, purportedly, also with Roberge, in order to show an alternative cause of the victim's vaginal injuries. The defendant contends that that evidence was admissible under the first exception to the rape shield statute. Under that exception, "no evidence of the sexual conduct of the victim may be admissible unless such evidence is (1) offered by the defendant on the issue of whether the defendant was, with respect to the victim, the source of semen, disease, pregnancy or injury . . . ." General Statutes § 54-86f (a) (1). In the alternative, the defendant argues that such evidence was admissible because the state "opened the door to it."

The following facts are relevant to this argument. As previously mentioned, the victim testified on direct examination during the state's case-in-chief that she had vaginal pain and bloody vaginal discharge as a result of the alleged sexual assault by the defendant. Before cross-examining the victim, the defendant, in the absence of the jury, requested that he be permitted to ask her about her prior sexual conduct on the ground that it was probative of the cause of her vaginal injuries. The court denied that request. On appeal, the defendant's argument relies not only on those facts known to the court at the time that it considered and denied the defendant's request, but also on evidence introduced subsequently. Thus, the particular theory of admissibility that the defendant advances on appeal is different from that considered by the court at trial and, therefore, is unpreserved. Accordingly, we review it under *State* v. *Golding*, supra, 213 Conn. 239–40; see also *State* v. *Adorno*, supra, 121 Conn. App. 548 n.4.

Because we find that the evidence as proffered by the defendant was not relevant to the issue of whether someone else caused the victim's vaginal injuries, the defendant has failed to demonstrate that the alleged constitutional violation exists or that it deprived him of a fair trial. See *State* v. *Golding*, supra, 213 Conn. 240. As previously set forth, " '[r]elevant evidence' means

evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1. "Although the standard for relevancy is quite low, it is often applied with some rigor." C. Tait & E. Prescott, supra, § 4.1.4, p. 155. "Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter." (Internal quotation marks omitted.) *State* v. *Bell*, 113 Conn. App. 25, 44–45, 964 A.2d 568, cert. denied, 291 Conn. 914, 969 A.2d 175 (2009). "The determination of relevance must be made according to reason and judicial experience." (Internal quotation marks omitted.) *State* v. *Shehadeh*, 52 Conn. App. 46, 51, 725 A.2d 394 (1999).

To recap, the defendant represented at trial that there was evidence of the following: (1) that the victim and Boyle had sexual intercourse in the hours leading up to the alleged sexual assault; and (2) that the victim and Roberge "may" have had sexual relations in the twenty-four hours before the incident. We also know that the defendant attempted to open the evidence in order to introduce a purported makeshift "panty liner" with "stains" on it (the proposed inference being that it was the victim's, and that it showed that she had bloody vaginal discharge *before* the sexual intercourse with the defendant on the railroad tracks). We also know from the victim's testimony that the defendant digitally penetrated her vagina (with her consent) in the bar's parking lot, and that penile-vaginal and penile-anal intercourse occurred between them on the railroad tracks. Finally, the defendant also introduced expert testimony from Underwood in which she stated that "rough" consensual sexual relations can cause vaginal trauma.

In our view, the preceding evidence is not probative of whether the victim's vaginal injuries could have been caused by anyone other than the defendant. We note first that, for purposes of appellate review, the purported makeshift panty liner has no probative value. As previously mentioned, the defendant sought to introduce this item after the evidentiary portion of the trial. No testimony was heard concerning it, nor, to our knowledge, was any testing performed on it. We therefore do not know whether (1) the item actually *was* used as a panty liner; (2) if it was, whether the substance on it was blood; and (3) if it both was used as a panty liner *and* was determined to have blood on it, whether it was the victim's blood. "[I]t is well established that this court does not make findings of fact." *Clougherty* v. *Clougherty*, 162 Conn. App. 857, 865–66 n.3, 133 A.3d 886, cert. denied, 320 Conn. 932, 136 A.3d 642 (2016). Accordingly, the alleged makeshift panty liner plays no role in our analysis.

Second, the fact that Underwood testified that "rough" consensual sexual relations can cause vaginal injury is unhelpful to the defendant because he proffered no evidence that the victim and Boyle or the victim and Roberge in fact *had* a "rough" sexual encounter. The defendant appears to suggest on appeal that heroin use is somehow associated with an increased likelihood of having a "rough" sexual encounter, but he provided no evidence in support of that proposition at trial. Thus, he does not draw our attention to any such evidence in the present appeal.

Third, the defendant's offer of proof with respect to the victim's sexual conduct with Roberge (if any) was inadequate. "[A]n offer of proof should contain specific evidence rather than vague assertions and sheer speculation. . . . The offer of proof may be made in the absence of the jury by the testimony of a witness or by a good faith representation by counsel of what the witness would say if questioned." (Citations omitted; internal quotation marks omitted.) *State* v. *Shaw*, supra, 312 Conn. 106 n.13. The defendant's offer of proof with respect to the victim's possible sexual intercourse with Roberge was merely speculative. At trial, the defendant stated that the victim "may" have had sexual intercourse with Roberge in the twenty-four hours preceding the alleged sexual assault. The defendant did not specify which witness would testify as to the possible sexual intercourse between them, nor did the defendant provide the expected substance of that testimony. Absent any such information, the defendant's proposed inquiry appears to have been nothing more than a fishing expedition. See *State* v. *Martinez*, 106 Conn. App. 517, 544, 942 A.2d 1043 (2008) (*Bishop, J.*, dissenting) (The defendant's offer of proof that was made in order to pierce the rape shield statute was inadequate because he "never offered any specific evidence, but rather made reference to two arrest warrant applications containing double and triple hearsay statements without providing the court any basis on which these arrest warrant applications could be made admissible, and he made a vague reference to the possibility of calling some unnamed witnesses with no indication of what any of them would state under oath. . . . [I]t appears from the record that counsel simply wanted to use some of the allegations set forth in the arrest warrant applications as fodder for cross-examination of the victim."), rev'd, 295 Conn. 758, 991 A.2d 1086 (2010). Accordingly, the court was not bound to assume, as part of the defendant's offer of proof, that the victim and Roberge actually had engaged in sexual intercourse.

We are thus left with the fact that the victim had sexual relations with Boyle, which, as previously noted, the state did not dispute. In our view, the fact that the victim had intercourse with another individual in the hours preceding the two instances of intercourse with

the defendant is not, without more, probative of whether someone other than the defendant caused the victim's vaginal injuries. See generally *State* v. *Green*, 55 Conn. App. 706, 712, 740 A.2d 450 (1999) ("[T]he defendant presented no evidence whatsoever to support his contention that [vaginal scratches sustained by the victim] could have been caused by consensual intercourse. . . . [T]he defendant's assertion, without an offer of medical proof that consensual intercourse could cause vaginal scratches . . . is speculative, not probative. . . . The court properly excluded the evidence as irrelevant."), cert. denied, 252 Conn. 920, 744 A.2d 438, cert. denied, 529 U.S. 1136, 120 S. Ct. 2019, 146 L. Ed. 2d 966 (2000); see also *State* v. *Siering*, 35 Conn. App. 173, 177–78, 644 A.2d 958 ("[The defendant] proffered no evidence establishing that, despite her testimony to the contrary, the victim had been injured prior to her encounter with him. Furthermore, he proffered no evidence as to how consensual sexual contact would have caused injuries of the type suffered by the victim; nor did he show how his proffered evidence would tend to demonstrate that he was not the source of the victim's injuries."), cert. denied, 231 Conn. 914, 648 A.2d 158 (1994). In the present case, the defendant did not proffer any evidence that the sexual intercourse that the victim and Boyle engaged in was of a type likely to cause vaginal injury. The defendant could have questioned Underwood about the likelihood that consensual "nonrough" sexual relations would cause bloody vaginal discharge and then incorporated the answer, if favorable to the defendant, into another offer of proof seeking admission of the prior sexual conduct evidence, but the defendant did not do so. See generally *State* v. *Franko*, 199 Conn. 481, 487, 508 A.2d 22 (1986) ("[The trial court] permitted the defendant to conduct a lengthy cross-examination of the treating physician in an attempt to establish the necessary causative link between the victim's prior sexual status and the injuries she received. Nevertheless, despite these multiple opportunities, the defendant totally failed to establish such a link."). Thus, because "the preclusion of irrelevant evidence does not infringe on a defendant's right to confrontation or his right to present a defense"; *State* v. *Adorno*, supra, 121 Conn. App. 548 n.4; we are not persuaded that the alleged constitutional violation exists or that it deprived the defendant of a fair trial.[10] See *State* v. *Golding*, supra, 213 Conn. 240.

As a final matter, we address the defendant's argument that *State* v. *Shaw*, supra, 312 Conn. 85, is determinative of the present case. In *Shaw*, the defendant was convicted of, inter alia, sexual assault for having vaginal intercourse with his partner's eleven year old daughter. Id., 89. Immediately after the sexual assault, the daughter was evaluated at a hospital. Id., 90. At the defendant's trial, the physician who examined the daughter testified that, at the time of her admittance, the daughter had

vaginal tears that had been sustained within the previous seventy-two hours. Id., 92. The defendant sought to introduce evidence that, three days before the alleged sexual assault, the daughter had had sexual intercourse with her fifteen year old brother. Id. The defendant argued that such evidence was relevant and admissible under, inter alia, § 54-86f (a) (1) in order to show that he was not the source of the vaginal injuries. Id., 92–93. The trial court excluded the evidence. Id., 99. On appeal, our Supreme Court concluded that the proffered evidence was relevant and admissible under, inter alia, § 54-86f (a) (1) in order to show an alternative source for the daughter's vaginal injuries. Id., 106–109. *Shaw*, however, is distinguishable from the present case because common sense dictates that there is a greater likelihood that vaginal penetration of an eleven year old child would lead to the vaginal injury that occurred in that case. Without more information, we cannot say the same when the case involves an adult woman. Accordingly, *Shaw* is not on point.

For all of the foregoing reasons, we must reject the defendant's claim.

## II

The defendant's second claim is that the court violated his right to due process by denying his pretrial motion for costs to pay for investigative services necessary to his defense. We disagree.

The following additional facts are relevant to this claim. On September 19, 2013, several weeks before trial, the defendant filed a "Motion for Costs Related to Defense." In it, the defendant represented that he was indigent. He stated that he had been incarcerated for more than one year, had been without employment or income for more than fourteen months, and "had no real assets" on the date of his incarceration.

The motion further stated that the defendant "seeks to hire an investigator to assist in the trial preparation. The defendant will need to subpoena witnesses to trial and will therefore require the services of a state marshal or process server. Finally, the defendant expects to incur costs for the trial or hearing transcripts, which will be needed for ongoing trial preparation throughout the trial." The defendant asserted that "[t]he aforementioned costs/services are essential for the undersigned to adequately prepare for trial."

In his motion, the defendant relied principally on *Ake* v. *Oklahoma*, 470 U.S. 68, 83, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985), in which the United States Supreme Court held that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the [s]tate must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the

defense." In the present case, the defendant's motion was accompanied by an affidavit of indigency. In it, the defendant listed assets of zero and liabilities of $10,270. On appeal, the defendant represents that $10,000 of those liabilities represents money loaned by the defendant's mother to pay for his trial counsel's retainer.

The court heard argument on the motion that same day. At the hearing, defense counsel clarified that the request was for investigative fees related to "witnesses in the bar that evening." Counsel stated that "[t]here [were] a number of people in the bar [on the evening of the alleged sexual assault], probably five, six, bartender, et cetera, give or take . . . ." Counsel stated that "what we're looking for is some assistance in covering these costs, as [the defendant] is indigent, with respect to an investigator for use and preparation for trial, service of subpoenas, et cetera." In response to questioning by the court, defense counsel stated that the attorneys representing the defendant in this matter were acting as private counsel, and that the defendant's mother paid them a retainer fourteen months earlier.

The court ruled as follows: "Your client filed a speedy trial motion. Conceivably, this trial could have started today. So, if I have to make a finding that these witnesses are absolutely necessary for your defense—the fact that he's filed a speedy trial motion and the fact that this trial could have started today with witnesses being presented almost negates the necessity of this investigation. So, I'm going to make a finding that there really hasn't—I'm not convinced he's indigent, he's hired private counsel through his family, there are resources there, and I'm not convinced that these witnesses are an absolute necessity. So, based on the *Ake* [v. *Oklahoma*, supra, 470 U.S. 68] decision, I have to make those two findings. I'm not in a position to make those today. I'm denying your request for any funds to be supplied to defense counsel on behalf of their client."

The defendant argues that this court should review the trial court's ruling for an abuse of discretion and that because the court abused its discretion by denying the preceding motion, it violated his right to due process. See *State* v. *Clemons*, 168 Conn. 395, 404, 363 A.2d 33 ("[w]e cannot find . . . that the defendant's request [for an expert witness funded by the state] was reasonable and necessary under the circumstances and thus we cannot find that the court abused its discretion in denying the motion"), cert. denied, 423 U.S. 855, 96 S. Ct. 104, 46 L. Ed. 2d 80 (1975). We are not persuaded.

Analysis of the defendant's claim is governed by our Supreme Court's recent decision in *State* v. *Wang*, 312 Conn. 222, 92 A.3d 220 (2014). In *Wang*, our Supreme Court, addressing four reserved questions of law from the trial court; see General Statutes § 52-235; concluded in part that "due process, as guaranteed under the fourteenth amendment to the United States constitution,

requires the state to provide an indigent self-represented criminal defendant with expert or investigative assistance when he makes a threshold showing that such assistance is reasonably necessary for the preparation and presentation of his defense." *State* v. *Wang*, supra, 245. It further concluded that "the statutes governing public defender services require the [Public Defender Services Commission (commission)] to authorize public expenditures, to be paid from the commission's budget, for expert or investigative services for indigent self-represented defendants when the commission determines, as a threshold matter, that such services are reasonably necessary to the defense." Id., 264–65. The court also determined that "the trial court does not retain discretion to authorize" such expenditures. Id., 264.

The defendant has failed to demonstrate that the court abused its discretion by denying his request for funds because, pursuant to *Wang*, the court lacked the discretion to grant the request. See id.

Moreover, even if we were to review the court's ruling for an abuse of discretion; see *State* v. *Clemons*, supra, 168 Conn. 401–404 (our Supreme Court assumed, without deciding, that the trial court was the appropriate entity to grant or deny such requests); the record before us does not support the defendant's claim. The defendant failed to make a proper showing that the funds for investigative services were "reasonable and necessary" to the defense. Id., 404; see also *State* v. *Wang*, supra, 312 Conn. 245 (defendant must make "threshold showing that such assistance is reasonably necessary for the preparation and presentation of his defense"). As the court in the present case observed, the fact that the defendant filed a speedy trial motion, pursuant to which trial could have already begun by the time the defendant filed the motion for costs, militates against a finding that such funds were necessary to the defense. The primary rationale advanced by the defendant—that the defense needed to interview individuals who were present in the bar on the night of the alleged sexual assault—is not in and of itself a sufficient rationale.

Additionally, we observe that, before this court, the defendant merely speculates, but has failed to demonstrate, that the funds sought likely would have yielded evidence favorable to the defense or that the court's ruling left him financially unable to employ a constitutionally sufficient defense. Such speculation is insufficient to demonstrate the existence of reversible error. For all of the foregoing reasons, this claim fails.

### III

The defendant's final claim is that the state's closing argument was improper and deprived him of a fair trial. We disagree.

"Our jurisprudence concerning prosecutorial impro-

priety during closing argument is well established. [I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. Put differently, [impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question." (Internal quotation marks omitted.) *State* v. *Carrasquillo*, 290 Conn. 209, 222, 962 A.2d 772 (2009). "[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . ." (Internal quotation marks omitted.) *State* v. *Maguire*, 310 Conn. 535, 552, 78 A.3d 828 (2013).

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument.

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence [on] jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks [for] no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present

matters which the jury ha[s] no right to consider. . . .

"[I]t is axiomatic that a prosecutor may not advance an argument that is intended solely to appeal to the jurors' emotions and to evoke sympathy for the victim or outrage at the defendant. . . . An appeal to emotions, passions, or prejudices improperly diverts the jury's attention away from the facts and makes it more difficult for it to decide the case on the evidence in the record. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors [that] are likely to skew that appraisal. . . . An improper appeal to the jurors' emotions can take the form of a personal attack on the defendant's character . . . or a plea for sympathy for the victim or her family." (Citations omitted; internal quotation marks omitted.) Id., 553–55.

The defendant identifies numerous allegedly improper remarks made by the state, which he groups into four categories of impropriety. We discuss each such category, and the remarks that the defendant assigns to each, in the following subparts.

A

The defendant first argues that the state's closing argument contained several improper remarks that "attacked defense counsel and the defense tactics . . . ." We disagree.

"[T]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel. . . . There is a distinction [however] between argument that disparages the integrity or role of defense counsel and argument that disparages a theory of defense. . . . Moreover, not every use of rhetorical language is improper. . . . There is ample room, in the heat of argument, for the prosecutor to challenge vigorously the arguments made by defense counsel." (Internal quotation marks omitted.) *State* v. *James*, 141 Conn. App. 124, 149, 60 A.3d 1011, cert. denied, 308 Conn. 932, 64 A.3d 331 (2013).

The following facts are relevant. During closing argument, the prosecutor made the following remarks: "And bear in mind the cutting cross-examination that [the victim] went through. Defense counsel asked her a series of questions . . . she stood firm and stated that her recitation of the facts with respect to the sexual assault were accurate." The prosecutor also remarked: "Detective [James] Crean [of the Torrington police] got up on the [witness] stand, and he took his own fair share of cutting questions on cross." The defendant objects to the prosecutor's use of the term "cutting" to refer to defense counsel's cross-examination.

Further, during her rebuttal argument, the prosecutor made the following remarks (those to which the defen-

dant objects are emphasized): "[*Defense counsel*] *did a great job of testifying.* Pay close attention to the court's instructions that the arguments of counsel and any facts that they argue aren't evidence. It's your recollection of the facts. . . . So, there's just two examples [referring to alleged instances of defense counsel inaccurately recounting trial testimony during closing argument] of why you should really be careful about the *smoke and mirrors* you just saw, okay. And that's what it was. Counsel said, don't lose your common sense. Please, don't lose your common sense. When's the last time you had consensual sex and ran down the road naked, crying, calling the police. You didn't want to get in trouble? Why don't—why would you give a statement to the police? *Come on. That's what begs some sense of—some different sense of reality to come into play.* . . . What's consistent is that [the victim's] hands were filthy with abrasions from holding herself while [the defendant was] on top of her. She has a scratch on her breast. She's got another mark somewhere along the side of her chest, as indicated by the nurse. And her knees are bruised as she's kicking, the only thing she can move while he's on top of her. Come on. [Defense counsel] never asked her. There's no testimony about why there's no marks on her belly. *That's his spin on it.* There are equally consistent reasons that can be equally consistent reasonable inferences that can be drawn from the evidence you actually have in front of you. *Offensive? What's offensive, what's offensive is that conduct we're actually dealing with here.* It's not offensive that a nineteen year old girl went to a bar and tried to get drunk and gets drinks. . . . But do you know a nineteen year old girl, who, despite having done that, runs down the road naked, crying, curled up in a ball, saying, 'I was just raped. Call my mom.' You know?"

The defendant contends that the preceding statements demeaned, impugned the credibility of, and imputed an intent to deceive to defense counsel. According to the defendant, "[c]ollectively, these phrases invoked the highly offensive and completely improper myth of a sleazy defense attorney obtaining an acquittal by dishonest and manipulative tactics." As such, the defendant asserts, the remarks constituted prosecutorial impropriety and deprived him of due process. As an initial matter, we observe that the defendant did not object to any of the preceding remarks at trial. "It is well established law, however, that a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, [supra, 213 Conn. 239–40], and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. . . . Our Supreme Court has explained that the defendant's failure to object at trial to . . . the [occurrence] that he now raises as [an instance] of prosecutorial impropriety, though relevant to our inquiry, is not fatal to review

of his [claim]. . . . This does not mean, however, that the absence of an objection at trial does not play a significant role in the determination of whether the challenged statements were, in fact, improper. . . . To the contrary, we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time." (Internal quotation marks omitted.) *State* v. *Fernandez*, 169 Conn. App. 855, 867–68, 153 A.3d 53 (2016).

With respect to the prosecutor's use of the term "cutting" to refer to defense counsel's cross-examination of the victim and the police officer, we do not find those remarks to be improper. The prosecutor was permitted to comment on a witness' response to cross-examination, and the quality of that cross-examination, in order to argue that the witness' testimony was credible. See *State* v. *Ciullo*, 314 Conn. 28, 47–48, 100 A.3d 779 (2014) (prosecutor's description, during closing argument, of defense counsel's cross-examination as "lengthy and laborious," which prosecutor argued merely highlighted that testimony at issue was consistent throughout difficult cross-examination, not improper [internal quotation marks omitted]). "The occasional use of rhetorical devices is simply fair argument." (Internal quotation marks omitted.) *State* v. *Maguire*, supra, 310 Conn. 553. Moreover, the prosecutor's language was "neither colorful nor malicious . . . ." *State* v. *Ciullo*, supra, 48.

The phrase, "[defense counsel] did a great job of testifying," was similarly not improper. As her subsequent comments indicate, the prosecutor was making the point that defense counsel's recollection of the facts was not evidence—indisputably a correct statement of the law. See *State* v. *Grayton*, 163 Conn. 104, 113–14, 302 A.2d 246, cert. denied, 409 U.S. 1045, 93 S. Ct. 542, 34 L. Ed. 2d 495 (1972). The prosecutor then argued that defense counsel's recollection of certain testimony was, in the present case, inaccurate. The defendant asserts that the phrase at issue implied that defense counsel "had not based his argument on fact or reason, but had intended to mislead the jury by means of an artfully deceptive argument." (Internal quotation marks omitted.) We disagree. The prosecutor was permitted to contest defense counsel's recollection of trial testimony because such testimony "[bore] on the issue before the jury, namely, the guilt or innocence of the defendant." *State* v. *Young*, 76 Conn. App. 392, 404, 819 A.2d 884, cert. denied, 264 Conn. 912, 826 A.2d 1157 (2003); see also *State* v. *Swain*, 101 Conn. App. 253, 275, 921 A.2d 712, cert. denied, 283 Conn. 909, 928 A.2d 539 (2007). The remark did not stray into improper territory by implying that defense counsel's intent was to deceive the jury. Moreover, to the extent that the defendant contends that the remark was impermissibly sarcastic, we observe that "some use of sarcastic and informal

language, when intended to forcefully criticize a defense theory on the permissible bases of the evidence and the common sense of the jury, is not necessarily improper." *State* v. *James*, supra, 141 Conn. App. 150. The comment does not appear to us to have been an improper use of sarcasm for the purpose of impugning the role of defense counsel.

The prosecutor's remark, "Come on. That's what begs some sense of—some different sense of reality to come into play," was also not improper. The comment appears to have been made in response to the following statement made by defense counsel during closing argument: "What's [the victim's] motive? Well, can't figure it out. She's given us a couple reasons. I lied to protect my friends. I didn't want to get in trouble with the police. I didn't want them to get in trouble. I didn't want the bar to get in trouble. I'm glad she's so concerned about all these people. She had no problem, you may conclude, being untruthful about more than just those things that I've identified. You can conclude, it's reasonable to infer, that she may have been untruthful for other reasons." To the extent that defense counsel was arguing in that statement that the victim fabricated the sexual assault so that she and her friends would not "get in trouble," therefore, the prosecutor countered by questioning whether it was plausible (i.e., in accord with "reality") that one would attempt to avoid such trouble by initiating contact with the police. In making the comment at issue, the prosecutor was not attacking the credibility of defense counsel, but rather "focus[ing] the jury on weaknesses in the defendant's theory of defense . . . ." *State* v. *Maguire*, supra, 310 Conn. 558.

The prosecutor's remark, "That's [defense counsel's] spin on it," did not constitute impropriety. As previously set forth, the prosecutor made this remark in response to defense counsel's argument that, if the alleged sexual assault occurred in the manner described by the victim, with the defendant sexually assaulting the victim while she was on her stomach on the railroad tracks, then she would have had visible injuries to her stomach, which she did not. In *State* v. *Swain*, supra, 101 Conn. App. 273–76, this court addressed the question of whether the prosecutor use of the term "spin" to refer to defense counsel's argument was improper. This court concluded that "whether we view the word 'spin' in isolation or in the context in which it was uttered, we do not conclude that it either directly or by implication denigrated the integrity or the role of defense counsel. . . . We may presume that the jury was well aware that the defendant's attorney had summarized the evidence with a particular viewpoint or bias, namely, one in favor of his client. Pointing this out to the jury does not rise to the level of suggesting that a typical defense tactic has been employed; it merely states the obvious." (Internal quotation marks omitted.) Id., 275. For those same reasons, we conclude that the prosecutor's use of the word

"spin" in the present case was not improper.

Also not improper was the prosecutor's comment, "Offensive? What's offensive . . . is that conduct we're actually dealing with here." According to the defendant, this remark implied that "*defense counsel's arguments* [were] offensive." (Emphasis added.) We disagree with this interpretation of the prosecutor's remark. During closing argument, defense counsel made the following comments with respect to the testimony of Crean, the Torrington police officer who investigated the case: "[H]is answers as to why he overlooked that false statement . . . are ridiculous, they are offensive . . . ." Defense counsel also stated in reference to the victim: "This is the person that the state wants us to believe to support their case to argue that it's been proven beyond a reasonable doubt and to convict [the defendant]. That's offensive." We believe that the prosecutor, in responding with her remarks, was referring to the *defendant's* conduct (i.e., the sexual assault) as "offensive," not to any tactics employed by defense counsel. Accordingly, the prosecutor's remark was not improper in the manner claimed by the defendant.

Finally, the defendant argues that the prosecutor's use of the phrase, "smoke and mirrors," to describe defense counsel's closing argument was improper. The state, acknowledging *State* v. *Maguire*, supra, 310 Conn. 557 ("smoke and mirrors" improper), and *State* v. *Orellana*, 89 Conn. App. 71, 103, 872 A.2d 506 (same), cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005), concedes that the phrase likewise was improper in the present case. We therefore assume the same. The state, however, contends that the impropriety did not deprive the defendant of his due process right to a fair trial. We agree. "[O]ur determination of whether any improper conduct by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include the extent to which the [impropriety] was invited by defense conduct or argument, the severity of the [impropriety], the frequency of the [impropriety], the centrality of the [impropriety] to the critical issues in the case, the strength of the curative measures adopted, and the strength of the state's case." (Citation omitted; internal quotation marks omitted.) *State* v. *Carrasquillo*, supra, 290 Conn. 222. "In determining whether the defendant was denied a fair trial [by virtue of prosecutorial impropriety] we must view the prosecutor's comments in the context of the entire trial. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . [T]he state bears the burden of demonstrating beyond a reasonable doubt that there

is no reasonable likelihood that the jury's verdict would have been different absent the improprieties at issue." (Citations omitted; internal quotation marks omitted.) *State* v. *Angel T.*, 292 Conn. 262, 287–88, 973 A.2d 1207 (2009). We are not persuaded that the lone improper remark deprived the defendant of his right to a fair trial. Although the remark was not invited, it was isolated and not severe. See *State* v. *Orellana*, supra, 109 ("['smoke and mirrors'] neither strongly critical nor severely condemnatory of the defendant's attorney"). We also note that defense counsel did not object at trial to the prosecutor's use of the phrase, and "[d]efense counsel's objection or lack thereof allows an inference that counsel did not think the remarks were severe." (Internal quotation marks omitted.) Id. Further, the remark was not central to critical issues in the case—the trial was, of course, about the defendant's conduct with the victim, not "the integrity or institutional role of defense counsel"; (internal quotation marks omitted) id., 101; which we do not believe was substantially impugned by the comment. Defense counsel did not object to the remark, and the court did not deliver a remedial instruction concerning the remark. Nevertheless, any harm that the impropriety caused was mitigated by the court's statement to the jury, during instructions, that both defense counsel and the state "have represented their clients professionally, zealously and always within the bounds of propriety." Finally, the state's case was not weak. Although it largely came down to the jury's assessment of the victim's credibility, several aspects of the victim's testimony concerning the incident on the railroad tracks were corroborated by other sources of evidence.[11] Accordingly, we do not believe that "there is a reasonable likelihood that the jury's verdict would have been different absent the [impropriety]." (Internal quotation marks omitted.) *State* v. *Angel T.*, supra, 287. We must, therefore, reject this argument.

B

The defendant next argues that the state made an improper "golden rule" argument during closing remarks. We disagree.

The following facts are relevant. During her rebuttal argument, the prosecutor made the following remarks (the ones to which the defendant objects are emphasized): "Counsel said, don't lose your common sense. Please, don't lose your common sense. *When's the last time you had consensual sex and ran down the road naked, crying, calling the police. . . .* Offensive? What's offensive, what's offensive is that conduct we're actually dealing with here. It's not offensive that a nineteen year old girl went to a bar and tried to get drunk and gets drinks. It happens every single day of the week. I'm sure—*I'm sure each one of you knows somebody who might have gone into a bar under age, at some*

*point. You might even know a kid who didn't want to get in trouble. But do you know a nineteen year old girl, who, despite having done that, runs down the road naked, crying, curled up in a ball, saying, 'I was just raped. Call my mom.' You know?* I mean, and then she gives a statement to the police."

We observe the following legal principles relative to this argument. "A golden rule argument is one that urges jurors to put themselves in a particular party's place . . . or into a particular party's shoes. . . . Such arguments are improper because they encourage the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence. . . . They have also been equated to a request for sympathy. . . . We noted that golden rule claims arise in the criminal context when the prosecutor ask[s] the jury to put itself in the place of the victim, the victim's family, or a potential victim of the defendant. . . . The danger of these types of arguments lies in their [tendency] to pressure the jury to decide the issue of guilt or innocence on considerations apart from the evidence of the defendant's culpability." (Citations omitted; internal quotation marks omitted.) *State* v. *Stephen J. R.*, 309 Conn. 586, 605–606, 72 A.3d 379 (2013).

The defendant argues that the aforementioned remarks improperly sought to arouse the sympathy of the jurors "by asking them to think about a 'kid' or 'girl' who they know and how they would act if that kid had been raped." At trial, after the conclusion of closing arguments, the defendant made essentially the same argument, which the court rejected. We disagree with the defendant. In our view, the prosecutor, in making the remarks at issue, "was not appealing to the jurors' emotions or to their sympathies for the victim . . . [but, rather] was asking the jurors to draw inferences from the evidence that had been presented at trial regarding the actions of [the victim], based on the jurors' judgment of how a reasonable person would act under the specified circumstances." *State* v. *Bell*, 283 Conn. 748, 773, 931 A.2d 198 (2007). The prosecutor was merely arguing to the jurors that the victim's behavior— running naked from the scene of the incident—was at odds with how a "reasonable person" would act following consensual sexual relations. Accordingly, the remarks were not improper.

C

Third, the defendant argues that the prosecutor, during closing argument, improperly read and referred to documents not in evidence and misrepresented certain facts. We disagree.

The following additional facts are relevant. During her rebuttal argument, the prosecutor made the following remarks: "Cheryl Underwood corroborated everything she said to you during the trial we've already—

the incident that we're talking about, the forced sexual assault. Patient walked to some railroad tracks with an unknown male, was forced to her knees and told to perform oral sex on male. She refused. Forced to ground on knees, then on her back. Was then turned and forced onto her stomach. Male then forced vaginal intercourse with penile penetration. Male attempted anal penetration. Patient then was able to get up and ran with her shirt off down the street." The defendant then objected, to which the court responded: "Can't use the document. Use your notes." Although the record is not entirely clear on what "the document" was, the defendant asserts, and the state assumes, that it was a report that Underwood completed in connection with her treatment of the victim that was not admitted into evidence. We therefore assume the same.

"A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Internal quotation marks omitted.) *State* v. *Carrasquillo*, supra, 290 Conn. 222.

In the present case, the prosecutor did not refer to a fact not in evidence. While the prosecutor used Underwood's report as, apparently, an aid for recalling portions of her testimony during closing argument, the testimony that the prosecutor recounted was, almost verbatim, the same testimony that the prosecutor elicited from Underwood during the evidentiary portion of the trial. Moreover, the prosecutor did not suggest in closing that there *was* a report completed by Underwood that would corroborate Underwood's testimony. The defendant has not provided any authority in support of the proposition that merely *looking* at a document not in evidence during closing argument is improper, and we are aware of none. This argument, therefore, fails.

The defendant also contends that the prosecutor misrepresented certain facts. The relevant portion of the prosecutor's closing argument is as follows: "And bear in mind the cutting cross-examination that [the victim] went through. Defense counsel asked her a series of questions, and she admitted each time . . . I didn't talk about the consensual sex behind Snapper Magee's, but she stood firm and stated that her recitation of the facts with respect to the sexual assault [was] accurate. And defense counsel only pointed out one inconsistency, which she did not remember saying, which was to the [emergency room] doctor, that it had occurred on the street—on a street. Now, she didn't recall saying that. It had nothing to do with the actual incident itself. And I submit, it's up to interpretation. But Cheryl

Underwood, in my cross of her, documented that [the victim] told her exactly what she told you here in the courtroom with respect to that forcible, nonconsensual encounter." Later in closing argument, the prosecutor remarked: "And, again, the only inconsistency pointed out by defense in cross was her statement to the [emergency room] doctor that it happened on the street."

The defendant specifically objects to the prosecutor's "one inconsistency" remarks. The defendant argues that the prosecutor's "assertion that there was only one [inconsistency between the victim's original reporting of the incident and her testimony at trial] . . . could not be refuted by the defendant because the others were barred by the trial court's ruling on rape shield. This was improper." We note that the defendant did not raise this argument before the trial court. See *State v. Fernandez*, supra, 169 Conn. App. 867–68 (unpreserved claims of prosecutorial impropriety are reviewable, but "we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time" [internal quotation marks omitted]).

We disagree with the defendant's interpretation of the prosecutor's "one inconsistency" remarks. When read in context, the remarks pertained specifically to any inconsistencies between the victim's original reporting of the incident and her testimony at trial *concerning the intercourse on the railroad tracks*. The victim's inconsistent statements that were barred by the rape shield statute concerned events occurring *prior* to the sexual assault, and therefore would not fall within this category. Accordingly, the prosecutor's remarks were not improper in the manner claimed by the defendant.

### D

Finally, the defendant argues that the prosecutor improperly vouched for the victim's credibility during closing argument. We decline to review the merits of this argument.

According to the defendant, the prosecutor improperly vouched for the victim in the following statement during closing remarks: "If [the victim] wanted to keep her boyfriend from finding out about consensual [sexual relations] with another man, that was not the way to do it. And I submit that you can take away from that, that she is being credible, that there was not a motive for her to fabricate this subsequent sexual assault that was forced." We conclude that this argument is inadequately briefed. The defendant does not cite any legal authority with respect to this argument, nor does he provide any analysis aside from his conclusory statement that the remark constituted improper vouching.

We therefore decline to reach the merits of this argument. See *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, 286 Conn. 57, 87, 942 A.2d 345 (2008).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[2] We note that although § 54-86f has been amended since the events at issue here, that amendment is not relevant to this appeal. For convenience, we refer to the current revision of § 54-86f.

[3] At oral argument, the defendant withdrew his fourth claim, identified in his brief as, "The Trial Court Erred in Failing to Conduct an In Camera Review of Relevant Material for Cross-Examination."

[4] The charge of false statement in the second degree in violation of § 53a-157b (a) was based on representations that the defendant made in two statements to the Torrington police concerning the incident. Specifically, the state presented evidence that the defendant told the police that, after the sexual intercourse on the railroad tracks, the victim put on her bra, pants, and shirt. Evidence was presented at trial that the victim was running topless after the encounter on the railroad tracks, and the state also presented photographs showing the victim's bra lying on the tracks and her shirt lying on a street near the tracks.

[5] Later in the trial, the prosecutor specified that the victim "had apparently been seeing [this boyfriend] for a couple weeks, and she admits that they had had sexual intercourse, and in fact that [the boyfriend] had ejaculated."

[6] How precisely the defendant would have presented that evidence to comply with our rules of evidence concerning impeachment of witnesses; see Conn. Code. Evid. § 6-10; is unclear.

[7] During cross-examination, the victim admitted that she had, in statements to the police and hospital staff, fabricated several events preceding the sexual assault in part so that she, Gomez, Boyle, and the bar would not be implicated in any of her activities involving heroin or underage drinking. She testified on cross-examination that she had told both the police and hospital staff that a man she met at Burger King had given her alcohol, and that that man had sexually assaulted her. (As previously mentioned, the state presented evidence to support a finding that the victim had actually met the defendant at the bar, and there was no indication that he had given her alcohol.) The victim also admitted on cross-examination that she had lied to hospital staff by denying drug use, and that she had neglected to tell the police about the consensual sexual encounter between her and the defendant in the bar's parking lot. The defendant cross-examined the victim with regard to several other inconsistencies as well. After reviewing the record, we are, therefore, persuaded that the defendant was able to thoroughly cross-examine the victim and impeach her credibility.

[8] For the first time, in his reply brief, the defendant appears to argue that evidence concerning the victim's relationship with *Roberge* should have been admitted (presumably under the fourth exception to the rape shield statute) to show a motive for the victim to fabricate the sexual assault. "It is a well established principle that arguments cannot be raised for the first time in a reply brief." (Internal quotation marks omitted.) *State* v. *Garvin*, 242 Conn. 296, 312, 699 A.2d 921 (1997). Accordingly, we decline to review the merits of this argument.

[9] This argument poses its own problems for the defendant because, according to the victim's testimony, Boyle left Snapper Magee's *before* the victim's first interaction with the defendant.

[10] For the same reasons, we reject the defendant's argument that the proffered evidence should have been allowed in because the state "opened the door to" it. Additionally, to the extent that the defendant argues that the proffered evidence should have been admitted under § 54-86f (a) (4) in order to show an alternative source for the victim's vaginal injuries, the foregoing analysis in the body of this opinion disposes of this argument as well.

[11] For instance, the state presented the testimony of two bystanders who stated that they saw the victim naked or partially naked in downtown Torrington in the early morning hours of September 3, 2011. One of those witnesses testified that the victim told him that she had been raped. Items

of clothing belonging to the victim were found at or near the railroad tracks. See footnote 4 of this opinion. The state also presented photographic evidence of scrapes and bruises on the victim's body. Underwood testified about the description of the sexual assault that the victim had given at the hospital; that description was largely consistent with the victim's trial testimony. The state also elicited the testimony of Cynthia Jock, who lived with the defendant and who saw him the morning after the incident. In response to the state's question of whether "[the defendant] was more nervous than [she] had ever seen him before," Jock answered yes.

―――――――――――――――――――――